# STATE OF OREGON, *Respondent,*
## *v.*
# ERIC CONRAD GRESSEL, *Petitioner.*

554 P2d 1014

*J. Marvin Kuhn,* Deputy Public Defender, Salem, argued the cause for petitioner. With him on the briefs was Gary D. Babcock, Public Defender, Salem.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

HOLMAN, J.

## HOLMAN, J.

Defendant was indicted for criminal activity in drugs by possession on his person of 1.8 ounces of marijuana. Prior to trial he filed a motion to suppress the seized marijuana on the ground that the police officer did not have probable cause to search him. This motion was denied. Defendant then stipulated to certain facts, waived trial by jury, and was found guilty as charged by the trial court. The Court of Appeals affirmed without opinion. 24 Or App 525, 546 P2d 478 (1976). We granted review to determine if the motion to suppress was correctly denied.

The pertinent facts are as follows. At about 1:20 a.m. on May 16, 1975, a Lieutenant Cutler of the Eugene Police observed a man walk behind a Sizzler Family Steak House, disappear from sight for a few minutes, reappear and then walk away. Cutler investigated and discovered that a window had been broken and an entry made into the restaurant building. Cutler promptly broadcast the description of the suspect as a "white male adult wearing a dark hip-length jacket" who had departed on foot, heading west.

An Officer Miller subsequently notified an Officer Grimes that he, Miller, had observed two possible suspects matching the description given by Cutler. Miller stated that while he was talking to one of the suspects, the other suspect saw him and turned and walked away. Grimes later spotted defendant (the second suspect) one-quarter to one-half mile from the Sizzler and proceeded to stop him. From where he was first reported as having been seen by Officer Miller, defendant had walked toward the scene of the crime to the location where he was stopped by Officer Grimes. Only ten minutes had elapsed between Cutler's broadcast and defendant's apprehension by Grimes. The record shows neither the time nor at what distance from the Sizzler defendant was first seen by Miller, but it must be inferred from the evidence disclosed

that it was earlier and at a greater distance from the Sizzler than when defendant was stopped by Grimes.

Grimes testified he first explained to defendant that a burglary had occurred and that defendant matched the suspect's description. Defendant was wearing jeans and a green military fatigue jacket. Grimes asked defendant to produce some identification and defendant complied. He then asked defendant what he was doing and where he was going. Defendant replied that he had been at a rock concert at the fairgrounds and was returning to his home in Springfield. This explanation was consistent with the direction in which defendant had been traveling since he was first seen by Officer Miller.

Grimes then asked if he could search defendant; defendant replied he did not want to be searched. Grimes inquired why; defendant related he was on parole. Grimes asked what defendant was on parole from; defendant said he was on parole from a conviction for burglary. Grimes then conducted a pat down search for weapons and found none. However, during the course of the frisk he patted bulges which he had noticed in two of defendant's jacket pockets and felt something soft. When he asked what was in the pockets, he was told, "Nothing." Grimes thereupon reached into one of the pockets and pulled out a bag of marijuana, at which point he placed defendant under arrest.

Officer Grimes testified that defendant answered all questions asked of him before the search, that he was "very cooperative," and that he did not appear to have been running or sweating. He also stated that although the pat down satisfied him that defendant was not carrying a weapon, he nevertheless reached into defendant's pocket because the soft substance he had patted felt to him as if it might be a roll of money taken in the burglary, although he admitted to not

knowing if any money, or indeed anything at all, had been taken in the burglary. He testified:

> "Q. Now, when you say you were checking for rolled up bills, did you mean you thought there might be a wad of bills, tight wad?
>
> "A. Well, I wasn't checking for anything in particular. That's what it felt like to me. But it could have been rolled up bills when I felt his pocket."

The officer further testified that in addition to becoming suspicious because of the feel of the substance in defendant's pockets, he was also aroused in his suspicions by defendant's refusal to consent to a search and by his response of "Nothing" when asked what was in his pocket.

■■ It is our opinion that after Grimes stopped defendant, questioned him and fruitlessly searched him for weapons, the officer did not have probable cause to search further in order to ascertain the contents in defendant's pockets. *See Sibron v. New York,* 392 US 40, 64, 88 S Ct 1889, 20 L Ed 2d 917 (1968). There is no question concerning the rule of law involved. The only question is the application of the law to the facts. In cases such as this, before an officer can search a defendant's pockets and remove the contents therefrom he must have probable cause to do so. In this case Officer Grimes had to have probable cause to believe defendant had possession of property stolen during the burglary in question, since the State does not contend there was reason to believe that at that time defendant had illegal possession of anything else.

■■ The facts advanced as tending to establish probable cause to believe there was stolen property in defendant's pockets are: (1) defendant fit the general description of the burglar; (2) defendant was one-quarter to one-half mile from the scene of the burglary; (3) defendant admitted he was on parole from burglary; and (4) two of defendant's jacket pockets had soft bulges in them. The search cannot be sustained on defendant's refusal to be searched nor on his response

[ 337 ]

of "Nothing" when asked what was in his pockets. If refusal to be searched were to furnish probable cause to search, anyone could be searched against his will. A mere assertion of one's constitutional rights cannot be a basis for depriving an individual of those rights. We view defendant's response to the inquiry concerning the contents of his pockets as merely an unsophisticated attempt to assert his right of privacy. *State v. Evans,* 16 Or App 189, 197, 517 P2d 1225 (1974).

The following facts discount those enumerated above: (1) the description of the suspected burglar was so general that it would fit the vast majority of men out on a May night in Oregon. They will be white and have jackets of hip length which will appear to be dark at night; (2) when first seen, defendant was a long way from the burglary, which had been reported less than ten minutes earlier, almost immediately after its happening; (3) defendant, after seeing Officer Miller, walked *toward* the scene of the burglary before being apprehended by Officer Grimes; (4) defendant cooperated fully in answering the officer's questions and in giving identification, and his answers were consistent with his presence at that time and place; (5) defendant manifested no unusual conduct or appearance. There was no evidence he appeared nervous, and there was the officer's testimony that defendant did not appear to have been running, and was not sweating; (6) soft bulges in a person's pockets can be literally thousands of things other than money; and (7) the officer had no knowledge of any money being stolen.

It is our conclusion there was insufficient probable cause for the officer to invade defendant's pockets. It is not normal for a person escaping the scene of a crime to walk toward it. The only information of real consequence possessed by the officer was that defendant had been convicted of burglary. This was, however, insufficient to justify the search of defendant's pockets after it was ascertained he was not armed. Defendant's refusal to give consent to a search undoubtedly caused the officer to have a healthy suspicion that defendant

was probably in illegal possession of something; but such a suspicion, however well founded, having been aroused merely on the basis of an assertion of one's constitutional rights, can play no part in creating probable cause for a search.

The judgment of conviction is reversed.

**HOWELL, J.,** dissenting.

The only issue in this case, as the majority points out, is whether the officer had probable cause to search the defendant. Also, as stated by the majority, the only question is the application of the law to the facts. The facts have previously been determined against the defendant by a circuit judge who heard the testimony on the motion to suppress and by the Court of Appeals. They both decided that the officer had probable cause to search the defendant. I agree. Officer Grimes had been advised 10 minutes previously that a white male person wearing a hip length jacket had been seen behind the Sizzler Restaurant and that entry had been made into the restaurant. Defendant was stopped by Officer Grimes at a spot one-quarter to one-half mile from the scene at 1:30 in the morning. He was wearing a dark coat or jacket. He advised Officer Grimes that he was on parole for the crime of burglary. Two of the jacket pockets had a soft bulge in them which the officer felt could be rolls of money.

Considering all the testimony, particularly that a burglary had been committed a short time previously, that the defendant had the same general appearance as the suspect in the burglary and that defendant was on parole also for burglary, I have no difficulty concluding that the officer had probable cause to search the defendant.

I would affirm the Court of Appeals and the trial court.

Tongue, J., and Bryson, J., join in this dissent.