Argued and submitted January 23, reversed and
remanded for trial June 16, reconsideration denied July 22,
petition for review denied September 3, 1980 (289 Or 588)

## STATE OF OREGON,
*Respondent,*

*v.*

## RONALD DALE BISHOP,
*Appellant.*

## (No. 78-11-18689, CA 14783)

612 P2d 744

David L. Slader, Portland, argued the cause and filed the brief for appellant.

Christian W. Van Dyke, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Joseph, Presiding Judge, Richardson, Judge, and Schwab, Chief Judge.*

JOSEPH, P.J.

---

*Schwab, C. J., *vice* Lee, J., deceased.

**JOSEPH, P.J.**

Defendant was convicted by the court on a charge of possession of a controlled substance. ORS 475.992. He assigns as error the trial court's denial of his pre-trial motion to suppress evidence seized from his person and the overruling of a demurrer and alternative motion to dismiss the information for failure to state a crime.

On November 18, 1978, pursuant to a warrant to search for drugs and drug paraphernalia, Portland police officers entered and searched a residence. The warrant authorized the search of the house and another individual. Defendant was a guest at the house at the time the police executed the warrant, but the warrant did not authorize the search of his person.

Prior to the search, the six officers who subsequently executed the warrant had had the house under surveillance. Several people were observed going in and out of the house. When the police entered, some, if not all, of the officers had their guns drawn. At the time of entry, there were seven people in the house. Four were in the living room; the others were elsewhere. Defendant was observed only in the living room. The officers spread out into the different rooms and directed everyone into the living room. The officer in charge testified at the suppression hearing that neither the defendant nor any of the others did anything which indicated that they were armed and dangerous.

Very shortly after their entry, estimated to be between 30 and 60 seconds by the officer in charge, the police had the situation under control. All the people in the residence were under guard in the living room. At that time, the police proceeded to frisk or search everyone, including the defendant. The extent of all the frisks or searches is not disclosed by the record. A film canister containing amphetamines was found on the defendant. He was immediately arrested and handcuffed. Other drugs were later found in his

mouth, when an officer investigated the source of an impediment in his speech. The search of the residence revealed marijuana, cocaine and drug pills in various rooms, some in plain view, some concealed.

Defendant moved to suppress the evidence found in the canister, a statement made after his arrest and the drugs found in his mouth. In denying the motion to suppress, the trial concluded:

"All right. After the legal entry upon the premises, based upon the search warrant, I hold and — find, rather, that the patdown or the frisk was reasonable at its inception. It did not violate the Fourth Amendment because its intensity and scope in this case were not unreasonable nor unwarranted under the circumstances — the totality of the circumstances, as I heard them. In other words, it was not a prohibited, general exploratory search.

"The motion to suppress is *** denied."

Defendant contends that the court erred in concluding that the "frisk" was a limited patdown, reasonable under the circumstances, and not a general search. He argues that even a limited frisk of his person was unjustified.[1] He also maintains that even if a limited frisk of his person was lawful, the state failed to sustain the statutory burden of proof[2] of its validity. He notes that the state did not offer the testimony of the officer who conducted the frisk and discovered the canister containing amphetamines. The only evidence

___

[1] Defendant asserts that the "frisk" was not justified by *Terry v. Ohio,* 392 US 29, 88 S Ct 1868, 20 L Ed 2d 889 (1968), because there is no evidence that the officer believed a crime was about to be committed. He also contends that the frisk was not justified under Oregon statutes (ORS 131.615 and 131.625), because the officers did not have a reasonable suspicion that he "has committed a crime."

[2] Defendant relies on ORS 133.693(4):

"Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution."

That statute by its terms applies to warrantless searches. We do not consider its applicability to this case because of our conclusion on defendant's frisk argument.

on the issue was the testimony of another officer who observed only the beginnings of the frisk, then turned away and moments later heard the searching officer say, "Look what I found" as he displayed the already opened canister.

The state relies on *State v. Garza,* 32 Or App 643, 574 P2d 1151, *rev den* 283 Or 1, *cert den* 58 L Ed 2d 663 (1978).[3] In that case we concluded that the officer was justified under the circumstances[4] in conducting a patdown search of persons present during the execution of a premises search warrant when a reasonably prudent person would have been warranted in the belief that the officers' safety was in danger. It was not explicitly founded on *Terry v. Ohio,* 392 US 29, 88 S Ct 1868, 20 L Ed 2d 889 (1968), or ORS 131.605 *et. seq.,* the statutory stop and frisk provisions, although it did adopt the general *Terry* standard that "Under these circumstances, a reasonably prudent person would be warranted in the belief that the officer's safety was in danger." *State v. Garza, supra* at 646.

The defendant challenges the continuing vitality of *Garza* since the decision in *Ybarra v. Illinois,* 444 US 85, 100 S Ct 338, 62 L Ed 2d 238 (1979), decided after *Garza* and on which defendant here in part relies. That case involved a frisk and search of a person present during the execution of a search warrant for a tavern and another individual. The state in *Ybarra* argued that the first patdown search of the defendant constituted a reasonable frisk for weapons under the *Terry* doctrine. The court disagreed:

---

[3] The state argued at the suppression hearing that the film canister was discovered during a search incident to his arrest for criminal drug promotion. ORS 167.222. Defendant was neither arrested for nor charged with that crime. The state does not assert that theory on appeal.

[4] The officers were executing a premises search warrant for drugs in a small apartment containing approximately 14 persons. The opinion does not state how many officers were involved; however, the impression is given that they were outnumbered.

"We are unable to take even the first step required by this argument. The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons. *Adams v. Williams,* 407 US 143, 146, 32 L Ed 2d 612, 92 S Ct 1921; *Terry v. Ohio, supra,* 392 US, at 21-24, 27, 20 L Ed 2d 889, 88 S Ct 1868, 44 Ohio Ops 2d 383: When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as police agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. At the suppression hearing, the most agent Johnson could point to was that Ybarra was wearing a 3/4-length lumber jacket, clothing which the State admits could be expected on almost any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.

"The Terry case created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain.' Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. *See, e.g., Adams v. Williams, supra* (at night, in high-crime district, lone police officer approached person believed by officer to possess gun and narcotics). Nothing in Terry can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons. The 'narrow scope' of the Terry exception does not permit a frisk for weapons on less than

[612]

reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." 62 L Ed 2d at 246, 247. (Footnotes omitted.)

We need not, and do not, decide how the broad language of *Ybarra* might apply to the facts of this case. The trial judge ruled that the frisk was "reasonable at its inception" and the search was not "unreasonable nor unwarranted under the circumstances." Whether the frisk could be sustained or not, the subsequent search that disclosed the canister required probable cause. *Sibron v. New York,* 392 US 40, 88 S Ct 1889, 20 L Ed 2d 917 (1968); *State v. Gressel,* 276 Or 333, 554 P2d 1014 (1976). The searching officer did not testify. The testimony of the officer who observed only the beginning of the frisk and the canister after it had been seized could not sustain a finding of probable cause. *State v. Gressel, supra,* 276 Or at 337. Failure to suppress was error.

Defendant also contends that evidence obtained subsequent to his arrest should be suppressed. *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). Following seizure of the canister, he made an incriminating statement which identified its contents. That statement was made shortly after his arrest at the residence while the officers were continuing to execute the search warrant of the premises. In considering the factors for the determination of "taint" outlined in *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978), *i.e.,* the passage of time and a change in place, we conclude that defendant's statement was a result of his unlawful arrest and must therefore be suppressed.[5] There was no evidence of events or circumstances which dissipated the taint.

--------

[5] That the facts in defendant's statement identifying the drugs would have been discovered independently of his statement does not render the statement itself admissible under the inevitable discovery exception to the exclusionary rule. *State v. McKendall,* 36 Or App 187, 584 P2d 316 (1978).

[613]

Defendant also urges that the other drugs found in his mouth must be suppressed for the same reason. We agree. Those drugs were found while defendant was talking to an officer in the kitchen of the residence. The search of the premises was continuing. The officer who discovered the drugs was talking to defendant while completing a property evidence form for the seized canister.[6] The officer noticed a speech impediment, got curious and discovered the controlled substances. Defendant was under arrest at the time and in handcuffs. The discovery was made while he was still at the residence. Defendant had no obligation to talk with the police; however, that he was doing so at the time of the discovery of the substances in his mouth was a result of his initial unlawful arrest. Therefore, we conclude that the subsequent discovery of drugs was tainted by the initial illegal police conduct. They, too, must be suppressed.

Finally, defendant maintains that the trial court erred in overruling the demurrer and denying the alternative motion to dismiss the information for failure to state sufficient facts to constitute a crime.[7] Defendant contends that when the Committee on Controlled Substances (Committee) and the State Board of Pharmacy (Board) failed to promulgate and publish new Oregon schedules for controlled substances by 30 days after July 1, 1978, and the United States Department of Justice Drug Enforcement Administration Act

---

[6] Another officer testified at the suppression hearing that he could not remember the reason that defendant was conversing with the officer.

[7] Defendant titled his motion as "Demurrer/Motion to Dismiss." The information contains all the statutory requirements of the offense. Defendant does not contend otherwise. In order for the court to conclude that the information was otherwise defective, reliance on facts that do not appear on the fact of the information would be necessary. *See State v. Kurtz,* 46 Or App 617, 612 P2d 749 (1980). A demurrer cannot be sustained under those circumstances. *State v. Gates,* 31 Or App 353, 570 P2d 670 (1977), *rev den* 281 Or 323 (1978). For that reason, the court properly overruled the "speaking demurrer." We treat defendant's motion as a motion to dismiss.

Schedules (which were temporarily adopted by Oregon) lapsed as of August 1, 1978, Oregon was, in effect, without any statutory prohibitions relating to controlled substances.

ORS 475.015(2) provides that the federal schedules were to be the Oregon classifications "until such time" as Oregon created its own schedules. ORS 475.055 provides:

> "The board shall publish the classification of controlled substances within 30 days of July 1, 1978, and thereafter within 30 days following the revision of the classification of a controlled substance."

The issue is whether ORS 475.015(2), which declares the federal schedules to be the Oregon schedules, is open-ended or whether it had a cutoff date of August 1, 1978, implied by the terms of ORS 475.055.

ORS 475.025 delegated to the Committee the discretionary authority to modify the federal schedules. It provided in part:

> "The committee may add, reclassify or delete any drug or its immediate precursor from the schedules designated in ORS 475.015 [the federal drug schedules]. The decision of the committee shall be based upon the total hazard potential of the substance. In determining total hazard potential, the committee, with the advice of the committee on drug problems, shall consider and rate each substance on the following potential consequences of acute or chronic maximum abuse ***."

The Committee was not required to modify the federal schedules. ORS 475.015(2) required that the Committee review and classify all the substances the federal schedules which were to remain in effect "until such time" as the Committee decided to adopt or change them, pursuant to its delegation. ORS 475.025.

When the Committee had not created new schedules by July 1, 1978, the Board temporarily adopted the federal schedules for the classification of controlled substances in effect on June 1, 1977,

and permanently published the federal schedules as the Oregon controlled substances schedules on October 13, 1978.[8] ORS 475.055.

The fact that the Committee did not create schedules different from the federal schedules does not mean that no schedules were in effect after August 1, 1978. There is no indication of legislative intent that the federal schedules were to lapse as of 30 days from July 1, 1978. ORS 475.055, contrary to defendant's contention that the federal schedules also expired 30 days after July 1, 1978, provides only that the Board publish classifications of controlled substances within 30 days of July 1, 1978, and thereafter within 30 days of revisions of those classifications. The motion to dismiss was properly denied.

Reversed and remanded for trial.

---

[8] Defendant argues that the Board improperly published the federal schedules because the Board was not acting on proposals submitted by the Committee. He relies on ORS 475.035(3), which required the Board to issue a rule for controlled substances when notified by the Committee of its decision on classification within 30 days of July 1. The Committee had not created new schedules by July 1, 1978; therefore, the Board in accordance with ORS 475.055 published the classifications of controlled substances then in effect. Even if we assume that the Board improperly published the federal schedules, as defendant suggests, ORS 475.015(2) nevertheless established the federal schedules as interim until such time as the Committee created and published new classifications.