Argued and submitted January 14, order of circuit court reversed, and case remanded to circuit court for further proceedings February 26, 2009

**STATE OF OREGON,**
*Plaintiff-Appellant,*

*v.*

**GERARDO VASQUEZ-VILLAGOMEZ,**
aka Gerardo Vasquezvillagomez,
aka Gerardo Vasquez-Villagome,
aka El Negro,
true name Gerard Vazquez Villagomez,
*Defendant-Respondent.*

(CC 060733947; SC S055774 (Control))

**STATE OF OREGON,**
*Plaintiff-Appellant,*

*v.*

**JOSE LUIS ZAMORA-CAMACHO,**
aka Jose Cuis Zamoracamacho,
*Defendant-Respondent.*

(CC 060733949; SC S055775)

203 P3d 193

14

Sally L. Avera, Senior Assistant Attorney General, argued the cause for plaintiff-appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General, Salem.

Bert Dupre, Portland, argued the cause for defendant-respondent Gerardo Vasquez-Villagomez.

James F. Halley, Portland, argued the cause for defendant-respondent Jose Luis Zamora-Camacho. With him on the brief was Laurie Bender, Portland.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

In this aggravated murder case, the trial court concluded that the police did not have probable cause to arrest defendants without a warrant and granted defendants' motion to suppress certain evidence obtained after their arrest. The state appeals directly to this court. ORS 138.060(2).[1] For the reasons that follow, we conclude that the police had probable cause to arrest defendants and therefore reverse the trial court and remand for further proceedings.

We take the facts from the record and the trial court's findings of fact. Defendants were arrested during the investigation of two east Multnomah County murders. The first murder victim, Rodolfo Romero-Lopez, Jr. (Romero), was shot and killed outside an apartment on Stark Street, near the Portland-Gresham boundary, late at night on May 31, 2006. The apartment's occupant told police that, just before the shooting, Romero and a female companion, Nicole Weber, had knocked on his door and asked to use his phone. He said that he had seen a Latino[2] man standing behind

---

[1] ORS 138.060 provides, in part:

"(1) The state may take an appeal from the circuit court to the Court of Appeals from:

"* * * * *

"(c) An order made prior to trial suppressing evidence[.]

"* * * * *

"(2) Notwithstanding subsection (1) of this section, when the state chooses to appeal from an order listed in paragraph (a) or (b) of this subsection, the state shall take the appeal from the circuit court to the Supreme Court if the defendant is charged with murder or aggravated murder. The orders to which this subsection applies are:

"(a) An order made prior to trial suppressing evidence; and

"(b) An order made prior to trial dismissing or setting aside the accusatory instrument."

[2] Below, witnesses and the trial court used the terms "Hispanic" and "Latino" interchangeably. On appeal, the parties do not make a distinction between the two terms. For purposes of uniformity, we use the term "Latino" throughout this opinion. *See, e.g., Hernandez v. New York*, 500 US 352, 355, 111 S Ct 1859, 114 L Ed 2d 395 (1991) ("Petitioner and respondent both use the term 'Latino' in their briefs to this Court. The *amicus* brief employs instead the term 'Hispanic,' and the parties referred to the excluded jurors by that term in the trial court. Both words appear in the state-court opinions. No attempt has been made at a distinction by the parties and we make no attempt to distinguish the terms in this opinion. We will refer to the excluded venire persons as Latinos in deference to the terminology preferred by the parties before the Court.").

Romero who looked about 22 years old, was six to eight inches taller than the victim, had a thin or lean build, and weighed between 150 and 160 pounds, with slightly dark skin and a shaved head. The apartment occupant handed Romero a phone and closed the door. He then heard what he thought were gunshots, went outside, and saw that Romero had been shot and was lying by the door.

Weber told the police that she and Romero had been sitting in his car near the apartment complex smoking marijuana, when two Latino men walked up and stood in front of the car. Romero appeared to know them and became concerned. When the two men walked away, Weber accompanied Romero to the apartment. After the apartment's occupant gave Romero the phone, the two men again approached. They spoke to Romero in Spanish. According to Weber, the taller of the two men then said, "I'm sorry," in English, and shot Romero. Weber described the shooter as a Latino man in his twenties, approximately six feet, three inches tall, of average build, and with a "relatively" shaved head. She described the second man as Latino, in his twenties, five feet eight to five feet nine inches tall, and skinny, with black spiked hair.

Romero's ex-girlfriend told the police that Romero and a man called "Choco" were involved in drugs together and that Choco had been upset with Romero. She did not know how to contact Choco but told the police the address of Choco's associate, "Alex." Romero's brother later called the police and confirmed that Romero had associated with a man known as "Choco" and identified Choco as Joel Sanchez-Jacobo (Jacobo). Police unsuccessfully attempted to contact "Alex," who they had determined was Alejandro Sanchez-Hernandez (Sanchez) and lived at the address provided by Romero's ex-girlfriend.

On July 10, 2006, Sanchez himself was shot and killed at his apartment. Sanchez's apartment was about a mile from where Romero had been killed. When the police arrived at the scene of Sanchez's murder, Sanchez's brother and Fidel Garcia-Garcia (Garcia) were at Sanchez's apartment. Garcia, who had known Jacobo for six years, and who had been visiting Sanchez, initially told the police that he had been asleep and had not seen anything. However, the

next day, he admitted that he had been awakened by the sound of an argument between Sanchez and Jacobo. Jacobo had been speaking to Sanchez in English. Garcia is not fluent in English, but understood when Jacobo told Garcia, "If you say anything I'll kill you." According to Garcia, two other Latino men, whom Garcia did not know, were also in the apartment. Neither man spoke. The taller of the two men held a gun pointed at Sanchez. Garcia was afraid, and he did not want to look at the faces of any of the men in the apartment for fear that he would be killed as a witness. When the argument ceased, Jacobo walked toward the door, then told the two other men to "take care of it," and said something about "10 minutes." About 10 to 15 minutes later, the taller man said, "I'm sorry," in Spanish, and shot Sanchez twice in the head. The two men then left through a sliding glass door in the back of the apartment.

Garcia described Sanchez's killer as a male Latino, about five feet, ten inches tall, medium build, around 165 pounds, 20 to 28 years old, short dark hair, not shaved, and wearing a dark blue t-shirt. Garcia did not see any facial hair. He described the other man as Latino, five feet, three inches tall, thin, about 125 pounds, 20 to 28 years old, and wearing a gray t-shirt. Again, Garcia did not see any facial hair.

Sanchez's brother, who lived in the same apartment complex, was home in bed and did not witness the murder. However, his wife heard gunshots and woke him up. Soon after, Garcia knocked on their door to tell him that Sanchez had been shot. Sanchez's brother went to check on Sanchez and then ran home. On his way back to his apartment, he saw Jacobo in his car in the parking lot and went to talk to him on the passenger side of the car. Jacobo told him to tell the other two men in the apartment to come out. When Sanchez's brother told Jacobo that the men were not in the apartment and that Sanchez had been killed, Jacobo immediately drove away.

On July 12, 2006, detectives working on the Romero and Sanchez murder cases shared information regarding their respective investigations and came to believe that the two murders were related. The police noted that there were

similarities between the two murders, including the facts that both victims had been shot, Jacobo had been involved with both victims, the descriptions of the two unknown men were similar, the taller man was the shooter in both cases, and the shooter had spoken the phrase, "I'm sorry," before each murder.

On July 13, 2006, three days after the Sanchez murder, police contacted a coworker of Jacobo's wife, Christina. The coworker told the police that, within the last few days, Christina had told her that Jacobo had switched cars with Christina and had driven Christina's car to California with two unidentified men because he was suspected of being involved in a homicide. Christina had told the coworker that she was trying to convince Jacobo to come back and get a lawyer. The coworker told the police that that morning, July 13, Christina had called her at work and explained that Jacobo was back and that the two of them were on their way downtown to talk to a lawyer.

At about 2:00 p.m. that same day, a Multnomah County prosecutor received a call from a lawyer stating that Jacobo was in the lawyer's office and was prepared to turn himself in on the Sanchez murder. The detective supervising the Sanchez investigation, Peterson, along with other detectives involved in the murder investigations, thought that, if Jacobo were not in custody, he would contact the two other men involved in Sanchez's murder. The detectives thought that Jacobo would want to share any information obtained from the meeting with the lawyer with the other men. At the detectives' direction, the prosecutor told the lawyer that Jacobo did not have to turn himself in to police. Police officers then located Jacobo's car in a parking lot near the lawyer's office and followed Jacobo and his wife after they left the office. The couple had a meal at a restaurant and then drove to Salem, bypassing their residence in Woodburn. Christina dropped Jacobo off near an apartment complex on Hawthorne Avenue in Salem. Jacobo walked into the complex, but police were unable to determine whom he contacted there. Meanwhile, Christina registered at the nearby Red

Lion Hotel. About 20 minutes later, Jacobo left the apartment complex and walked to the hotel, where he and his wife spent the night.

The next morning, July 14, 2006, at about 8:00 a.m., police officers saw Christina leave to go to work. At about 1:55 p.m., a woman picked Jacobo up at the hotel and drove him to a residence. A short time later, Jacobo dropped the woman off at a Salem business and drove back to the apartment complex on Hawthorne. There, he met two Latino men, later identified as defendants. The three drove to an auto dealership in Brooks and then back to the Salem apartment complex, where they went into an apartment on the second floor. At least one or two other Latino males also were in the apartment. Jacobo left after about 45 minutes.

As Jacobo and the two men drove around, the surveillance officers observed the two men in Jacobo's company. Peterson asked Officer Hernandez, who had received and translated Garcia's descriptions of the murder suspects, to talk to the surveillance officers to confirm that the two men matched those descriptions. After conversing with the surveillance officer, Hernandez told Peterson that the men did match Garcia's descriptions. Based on the description match and the other information that he knew from the investigation, Peterson believed that he had probable cause to arrest the two men, and he directed the officers in Salem to make the arrest. By that time, however, Jacobo had left the two men at the apartment complex. As the police gathered in an area near the apartment complex to prepare to arrest defendants, another Latino male, Antonio Martinez (Martinez), came out of the apartment and walked down the stairwell and toward the police. The police became concerned that they had been compromised and took Martinez into custody. He had an outstanding warrant and was arrested. Martinez was five feet, four inches tall, 130 pounds, clean shaven, and had a shaved head. Subsequently, as the police approached the apartment, defendants exited and were arrested.

Defendant Vasquez-Villagomez is Latino and is five feet, nine inches tall. At the time of the arrest, he was 25 years old, weighed 160 pounds, and had "short cropped

hair" and a goatee. Defendant Zamora-Camacho is Latino and is five feet, five inches tall. At the time of the arrest, he was 21 years old, weighed 140 pounds, had a shaved head, and wore a "soul patch."[3]

Before trial, defendants moved to suppress evidence obtained after their arrest, arguing that the eyewitness descriptions of the suspects were insufficient to provide the police with probable cause to arrest them without warrants. The trial court granted defendants' motion. The trial court determined that there was nothing distinctive about the descriptions provided by the witnesses. According to the trial court, the descriptions were general in nature, describing typical young Latino males in their twenties. In the trial court's view, there was nothing specific in the witness descriptions to lead to the belief that defendants were the men being sought and to establish probable cause to believe that defendants had committed either murder. Moreover, the trial court found it unlikely that both defendants could have grown facial hair in the four days between the Sanchez murder and their arrests. In addition, the trial court noted, defendants were observed by the police in a city different from the one in which the murders had occurred and, moreover, were seen there four days after the Sanchez murder and 45 days after the Romero murder. Finally, the trial court noted that the association between defendants and Jacobo, as witnessed by the police, was benign in nature. The trial court therefore concluded that the police did not have probable cause to arrest defendants. Accordingly, the trial court granted defendants' motion and suppressed certain evidence.[4] The state appealed that order directly to this court.

As noted, ORS 138.060(2) authorizes the state to prosecute to this court an expedited appeal of a pretrial order suppressing evidence in a murder or aggravated murder

---

[3] The term "soul patch" refers to a small growth of beard under a man's lower lip. *Merriam-Webster's Unabridged Collegiate Dictionary*, http://unabridged. merriam-webster.com / cgi-bin / collegiate?book = Dictionary&va = soul%20patch (last visited Feb 9, 2009).

[4] The trial court suppressed defendants' in-custody statements, booking photos, photo montages created from booking photos, identification and personal information obtained during the booking process, all out-of-court identifications by certain witnesses, and property seized from defendants at the time of their arrests.

case. On appeal, the state asserts that the trial court erred in granting defendants' motion to suppress evidence because the police, in the state's view, had probable cause to arrest defendants absent any warrant, based on all the information known to them at the time of the arrests. The state contends that, at the time that he instructed the officers in Salem to arrest defendants, the decision-making officer, Peterson, knew that (1) the police had probable cause to arrest Jacobo; (2) Jacobo had been involved with both victims and had been present just before the second murder; (3) two unidentified men with similar physical descriptions had committed each murder under similar circumstances, including the utterance of the phrase "I'm sorry"; (4) Garcia had been present in the apartment when the second murder had occurred and had seen both men; (5) the men seen with Jacobo in Salem on July 14, 2006, matched Garcia's descriptions of the taller shooter and his shorter companion; and (6) Jacobo had been aware that he was a suspect in the second murder and purportedly had left the state in the company of two men shortly after its occurrence, and, after he returned and contacted a lawyer, he did not go home but instead drove to Salem and contacted defendants, who were together.

Based on the foregoing, the state argues that

> "[d]efendants' joint propinquity or proximity to Jacobo on July 14, 2006, considered together with their appearance as a pair and near match to the physical descriptions of the killer and companion provided by eyewitness Garcia[,] support an objectively reasonable belief that it was more likely than not that defendants were culpable in the Sanchez murder."

The state acknowledges that mere propinquity or proximity to a person for whom the police have probable cause to arrest—in this case, Jacobo—does not alone support probable cause to arrest defendants. *See Ybarra v. Illinois*, 444 US 85, 91-92, 100 S Ct 338, 62 L Ed 2d 238 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). However, the state argues that propinquity is a significant factor to be considered in combination with the fact that defendants, who matched the description that Garcia had provided, met with Jacobo "at a time when it

was reasonable for experienced officers to believe that Jacobo[ ] would contact the two men [that] he had directed to murder Sanchez." The state explains that it was reasonable for the police to think that Jacobo would share what he had learned from the lawyer with the others involved in the murders. Although the police were not able to determine who Jacobo had contacted at the Salem apartment complex on July 13, 2006, the police knew that he had met defendants at that same complex the following day. Moreover, although the state acknowledges that Garcia did not see facial hair on either the shooter or his companion and, when arrested four days later, defendants had a goatee and a soul patch, the state argues that that discrepancy is "slight and explicable." The state concludes that, under the totality of the circumstances, the temporal circumstances of the contact between Jacobo and defendants and the fact that they were a pair whose appearance was similar to Garcia's description, established probable cause and that the trial court therefore erred in suppressing evidence gained from defendants' arrests.

Defendants counter that the descriptions of the perpetrators that Garcia had provided had been too general to support probable cause. In addition, defendants argue that, to the extent that Garcia's descriptions had been specific as to the perpetrators' lack of facial hair, both defendants, when arrested, had either a goatee or a soul patch and, as the trial court found, it was unlikely that either could have grown the hair in only four days. They assert that Martinez, the first man to come out of the apartment on July 14, 2006, and be arrested, was a better match for Garcia's description of the shooter's shorter companion. Defendants assert that the police merely arrested everyone that they thought might have some connection to the homicides and used those arrests to conduct further investigation. Finally, defendants argue that, when the police observed them with Jacobo, there had been no ongoing criminal activity, or even suspicious behavior, as far as the police could ascertain. Defendants were seen with Jacobo days after, and more than 50 miles from, the scene of the murders. Consequently, defendants assert that the police lacked probable cause to arrest defendants and the trial court therefore properly granted their motion to suppress evidence.

█ We begin with the standard of review. On review of a motion to suppress evidence, this court reviews for errors of law, ORS 138.220, and is bound by the trial court's findings of historical fact if there is evidence in the record to support them, *State v. Dahl*, 323 Or 199, 205, 915 P2d 979 (1996). Whether probable cause exists to support an arrest is a question of law, not fact. *State v. Miller*, 345 Or 176, 187, 191 P3d 651 (2008). A police officer may arrest a person without a warrant if the officer has probable cause to believe that the person has committed a felony. ORS 133.310(1)(a). ORS 131.005(11) defines "probable cause" to arrest as a substantial objective basis for believing that more likely than not an offense has been committed and that the person to be arrested has committed it.

█ Under Article I, section 9, of the Oregon Constitution,[5] two components comprise probable cause: "[a]n officer must subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure, and this belief must be objectively reasonable in the circumstances." *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986). The subjective component of the probable cause inquiry is satisfied if an officer believes that he or she has lawful authority to restrain the individual's liberty. *Miller*, 345 Or at 185. The state also must establish that the facts objectively are sufficient to establish probable cause. *Id.* at 186. In determining whether the state has established that the facts objectively are reasonable, the court looks at the totality of the circumstances, including the officer's training and experience. *See State v. Martin*, 327 Or 17, 22, 956 P2d 956 (1998) (applying standard). Subsequent validation of the officer's subjective or objective belief as to the existence of probable cause to arrest is irrelevant to the inquiry. *State v. Esplin*, 314 Or 296, 304-05, 839 P2d 211 (1992).

█ As noted, in determining whether the state established facts that objectively are sufficient to support a finding

---

[5] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

of probable cause to arrest defendants for the Romero and Sanchez murders, we consider the totality of the circumstances.[6] Here, Jacobo was associated with both victims, and each murder was committed by a pair of men, one tall, one short. The witness to the second murder, Garcia, who had been in the room with the men for about 15 minutes, described the shooter as a male Latino, around five feet, ten inches tall, medium build, around 165 pounds, 20 to 28 years old, and with short dark hair, not shaved. Defendant Vasquez-Villagomez is Latino and is five feet, nine inches tall. The trial court found that, at the time of his arrest, he was 25 years old, weighed 160 pounds, and had "short cropped hair" and a goatee. Garcia described the other man as Latino, five feet, three inches tall, about 125 pounds, and 20 to 28 years old. Defendant Zamora-Camacho is Latino and is five feet, five inches tall. The trial court found that, at the time of his arrest, defendant Zamora-Camacho was 21 years old, weighed 140 pounds, had a shaved head, and wore a soul patch. Except for the fact that Garcia did not see facial hair on either of the two men in Sanchez's apartment, and both defendants had facial hair at the time that they were arrested, defendants fit the descriptions that Garcia provided. The trial court concluded that it was "possible [that] Vazquez could have grown his goatee between the time the homicide witnesses provided descriptions and the arrest. It is less likely, given the thickness of Mr. Zamora Camacho's beard at the time of his arrest, that he grew the beard between July 10 and July 15." However, the presence or lack of facial hair on defendants is not dispositive—rather, it is only one fact considered in the totality of the circumstances.

Defendants assert that the first man arrested at the apartment complex, Martinez, was a better match for Garcia's description and that the police were merely collecting people that they thought might have some connection to the homicides. To support that assertion, defendants point out that, although the warrant for Martinez's arrest was issued in Marion County, he was taken to the Gresham Police

---

[6] Because ORS 136.432 generally precludes courts from excluding evidence for violation of a statute, we determine whether the police had probable cause to believe that defendants had committed the Romero and Sanchez murders under the standard established under Article I, section 9.

Department at the same time as defendants, before being transported back to Salem. However, Peterson testified that Martinez had been arrested because he had come near the arrest team gathering outside the apartment complex and the police had been concerned that Martinez would expose their presence. Peterson testified that Martinez had not been seen with Jacobo and that Peterson had become aware of Martinez only after his arrest. Peterson also testified that Martinez never had been a murder suspect, but was taken to Gresham to be questioned about his relationship to Jacobo and defendants. The police also wanted to question Martinez about anything that he might have heard defendants say inside the apartment or anything that he might have seen in defendants' possession at the time of their arrest. Peterson testified that he made the decision to arrest defendants while they were driving around Salem with Jacobo.

Defendants appear to be arguing that the police should have negated every other possible suspect before they arrested defendants. We disagree. The possibility that one of the other men discovered in the apartment in Salem *could* have ridden around in the car with Jacobo does nothing to negate a finding of probable cause as to defendants.

Defendants next argue that, as the trial court determined, Garcia's descriptions were too general to support probable cause because they could describe a large segment of the population based on race, gender, age, height, and weight. They point out that the trial court determined that "there is nothing specific about [Garcia's] description that would lead one to believe that [defendants] were the people being sought." Defendants rely on *State v. Gressel*, 276 Or 333, 335, 554 P2d 1014 (1976), in which a burglar was described as a "white male adult wearing a dark hip-length jacket," a description that the court found was "so general that it would fit the vast majority of men out on a May night in Oregon. They will be white and have jackets of hip length which will appear to be dark at night[.]" *Id.* at 335-38.

Here, we agree that, if the descriptions that Garcia had provided were the only basis upon which the police had arrested defendants, then their arrests—like the search in *Gressel*—might not have been supported by probable cause.

However, neither the generality of Garcia's physical descriptions of the perpetrators nor some of the indisputable differences between those descriptions and the appearance of defendants at the time of their arrests is significant here. Instead, the significance lies in the reported similarities between Garcia's descriptions and defendants' appearances, coupled with the uniting effect of the series of corroborating circumstances.

Simply stated, the descriptions that Garcia provided (a taller shooter and his shorter companion—both identified by race, gender, age, weight, and height) must be considered in the context of the ongoing investigation, which we summarize as follows. The police knew that two men, one tall and one short, and both associated with Jacobo, had committed each murder. Christina Sanchez's coworker had conveyed to the police conversations with Christina respecting (1) Jacobo's trip to California with two unidentified men; (2) Christina's attempts to convince Jacobo to come back and get a lawyer (because he was suspected of being involved in a murder); and (3) Jacobo's return from California and Jacobo's and Christina's immediate plan to speak to a lawyer. Jacobo's meeting with a lawyer occurred on July 13, 2006, and the lawyer immediately contacted the district attorney's office, suggesting that Jacobo wished to surrender to police in connection with the Sanchez murder. At that point, the police reasonably could have believed that Jacobo wanted to share any information obtained from the lawyer with the other men involved in the murders. After Jacobo bypassed his home in Woodburn on that same day and drove to Salem instead, the police reasonably could have believed that Jacobo had driven to Salem to meet the other two men involved. Moreover, the police reasonably could have believed that Jacobo had contacted defendants at the apartment complex on the night of July 13, in view of the fact that he then picked up defendants at the same apartment complex the following day.

The totality of the circumstances just described provided an objectively reasonable basis for Peterson to believe that defendants were the two men who had committed the Sanchez murder. We therefore conclude that defendants' arrests did not contravene Article I, section 9, of the Oregon

Constitution and that the trial court erred in concluding otherwise.

Because we have determined that defendants' rights were not violated under the Oregon Constitution, we next consider whether their arrests were unlawful under the United States Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers all questions of state law before reaching federal constitutional claims). Under the Fourth Amendment to the United States Constitution,[7] a warrantless arrest requires objective probable cause. *Devenpeck v. Alford*, 543 US 146, 152, 125 S Ct 588, 160 L Ed 2d 537 (2004). A warrantless arrest is reasonable if there is probable cause to believe that a criminal offense has been or is being committed. *Dunaway v. New York*, 442 US 200, 208 n 9, 99 S Ct 2248, 60 L Ed 2d 824 (1979). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment[.]" *Hill v. California*, 401 US 797, 804, 91 S Ct 1106, 28 L Ed 2d 484 (1971). Whether probable cause exists depends upon the totality of the circumstances and the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Maryland v. Pringle*, 540 US 366, 371, 124 S Ct 795, 157 L Ed 2d 769 (2003). However, unlike our analysis under the Oregon Constitution, an arresting officer's state of mind (except for the facts that he or she knows) is irrelevant to the existence of probable cause under the United States Constitution. *Devenpeck*, 543 US at 153.

Here, in addition to knowing that he had probable cause to arrest Jacobo, Peterson knew the following facts: (1) two unidentified men with similar physical descriptions had committed each murder under similar circumstances, including the utterance of the phrase "I'm sorry"; (2) the men seen with Jacobo in Salem on July 14, 2006, matched Garcia's descriptions of the shooter and his shorter companion; and (3) Jacobo had been aware that he was a suspect in

---

[7] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

the second murder and had contacted defendants shortly after attempting to turn himself in to the authorities. The United States Supreme Court has stated that "the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Pringle*, 540 US at 370 (quotations omitted). Under the totality of the circumstances, we conclude that it was reasonable to believe that, where defendants matched the descriptions that Garcia had provided, and where Jacobo had contacted them shortly after attempting to turn himself in, defendants were the two men who had committed the Sanchez murder. Thus, it was reasonable for Peterson to determine that probable cause supported defendants' warrantless arrests.

In sum, the trial court erred when it concluded that the police did not have probable cause to arrest defendants without a warrant, and it therefore should have denied defendants' motion to suppress evidence obtained after their arrests.

The order of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.