Argued and submitted June 17, 2014, reversed and remanded January 28, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WESTON HUGH YOUNG,
*Defendant-Appellant.*

Washington County Circuit Court
C120264CR; A151946

343 P3d 277

Meredith Allen, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Haselton, Chief Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

Defendant appeals his judgment of conviction for one count of manufacturing marijuana, ORS 475.856; one count of delivery of marijuana, ORS 475.860(2)(a); and one count of possession of marijuana, ORS 475.864. He assigns error to the trial court's denial of his motion to suppress, arguing that seizures of his person and his backpack were unlawful, and that evidence obtained during those seizures must be suppressed because it derived from those unlawful seizures. We agree with defendant, and we reverse and remand.

Officer Monico encountered, at night, a disabled car in the middle of a busy street in Cornelius. Monico, who was driving a marked police vehicle, parked behind the disabled car and activated his police lights. Monico saw that the driver's side door was open and that the driver's legs were hanging out of the door. Another man, who apparently had pulled over to assist, was helping push the car to the side of the road. Three passengers were inside, including defendant, who was in the back seat. As Monico got out of his vehicle and called out to the driver to inquire about the problem, the driver stood up outside of the car, looked at Monico, and reached back into the car toward the floorboard. Monico later testified that he was concerned that the driver was reaching for a weapon. Monico drew his gun and told the driver to not reach for anything under the seat, to put his hands on his head, and to step away from the car. Monico also ordered the three passengers, who were still seated inside of the car, to put their hands on their heads and to not lower their hands. Monico told the driver and passengers that he would "shoot them" if they moved. Monico called for backup, performed a patdown search on the driver, and directed him to sit on the curb.

Monico noticed the "overwhelming" odor of unburned marijuana emerging from the car. He asked the passengers where the marijuana was located and told them that he "wanted it." The two passengers in the back seat—defendant and Birdsong—"dropped their heads" and glanced toward a backpack on the floor. After a backup officer, Watts, arrived on the scene, Monico told the passengers to get out of the car and sit on the curb. He then requested identification from each of them and conducted patdown searches of their persons.

Monico searched the car and found a "turn signal post" under the seat where the driver had been reaching. He also found knives near the backpack. Monico removed the backpack from the car, placed it on the trunk, and asked if anyone wanted "to claim" the backpack and if he could search it. The driver replied, "Go ahead, it's not mine." The front-seat passenger denied ownership. For several seconds, neither defendant nor Birdsong said anything. Birdsong then said the backpack was his, in response to which Monico asked if the backpack contained marijuana. Birdsong said that it did contain marijuana, and that the marijuana inside belonged to both of them. Monico asked if he could search the backpack, and Birdsong and defendant consented to a search.

Monico found 12 bags of marijuana totaling 37.82 grams. Monico read defendant his *Miranda* rights and then questioned him about the marijuana. Defendant made incriminating statements, including that he and Birdsong had planned to sell the bags of marijuana at a party. Defendant and the others were released at the scene because Monico had to respond to another call. Defendant was later charged with one count of manufacturing marijuana, ORS 475.856; one count of delivery of marijuana, ORS 475.860(2a); and one count of possession of marijuana, ORS 475.864.

Defendant filed a motion to suppress evidence, including the backpack and its contents, obtained as a result of a "warrantless" search. He argued that he had been unlawfully stopped when Monico told him to put his hands on his head, and that the ensuing search was therefore illegal. The state responded that Monico had approached the car lawfully to investigate traffic infractions and that Monico's orders to the driver and passengers were justified by officer safety concerns. The state argued further that the smell of marijuana gave Monico probable cause to expand the scope of the traffic stop to investigate possible criminal conduct.[1]

---

[1] The state also argued below that Monico was authorized to search the backpack because it had been abandoned, or under the automobile exception to the warrant requirement. The trial court rejected those arguments, and the state does not pursue them on appeal.

The trial court denied defendant's motion to suppress. In doing so, the court addressed both the initial encounter and the subsequent search that led to the discovery of the marijuana:

"The original encounter, the Camaro's in the traffic lane of a main thoroughfare, Baseline. It's dead in the water, just being pushed very slowly along by basically a Good Samaritan.

"Officer Monico stops and turns on his lights of his vehicle. That may not have been a stop *** because a reasonable person under the circumstances might just think *** the lights are on for safety purposes, to keep other traffic from plowing into the cars[.]

"* * * * *

"The officer was in uniform. It was a marked patrol car. Officer Monico saw no rear plate. It was an old beater of a Camaro, didn't know if it was stolen or just broken down, maybe had been involved in an accident. There were a lot of possibilities at this point.

"The officer did have authority to contact the driver and the occupants of the car under community caretaking, ORS 133.033, to prevent serious harm to persons or property. ***. The encounter occurred *** shortly before midnight on New Year's Eve, so there was a greater than normal chance of inebriated drivers out on the highway who may not be keeping a proper lookout. ***

"Also, there was justification for it as a stop under ORS 810.410(3), stop and detain to investigate traffic offenses of blocking a lane or blocking a thoroughfare, ORS 811.550(12), and not showing a rear plate. ***"

The trial court also found that reasonable officer safety concerns justified Monico's drawing his gun and ordering the driver and the passengers to put their hands on their heads:

"ORS 810.410(3)(f) authorizes the use of degree of force reasonably necessary to accomplish the traffic stop, and that would include telling the people *** to basically freeze, put your hands on your head, and to the driver, [']Get out of the car.[']

"The driver sees the officer before the driver gets back in the car, and the chronology is the officer pulls up, as he's getting out of his car, the driver, who had been in his car but had one leg out, gets out of his car, sees the officer, recognizes the officer is an officer[.] * * * The officer asks him, [']What's wrong? What's the problem?['] And without answering, the driver gets back into the car and then reaches under the seat.

"And that's when Officer Monico has a reasonable concern that the driver might be going for a weapon. There's no backup there yet. * * * [U]nder these circumstances, when someone ignores the officer's question, gets in a car, reaches under the seat, it's reasonable for the officer to suspect there might be a weapon involved and someone may be wanting to use a weapon against him, so the officer has the authority, under ORS 810.410(3)(f), to use reasonable force to prevent that.

"And that's what Officer Monico does. He reasonably gets the driver away from the car, but he still has a problem. He doesn't have backup there yet and he's got a divided-attention issue in that he's got the driver and the occupants in different places. * * * The occupants of the car are near where he thought a weapon might be.

"The officer scares the occupants by telling them that— words to the effect that he'll shoot anybody who makes any quick moves. He does this after telling them to put their hands on their heads, and he's got his gun out. * * * All of this is a reasonable degree of force under (3)(f) of [ORS] 811.410."

The trial court concluded that Monico had reasonable suspicion that justified an extension of the stop once he approached the car and smelled marijuana:

"After the driver's out of the car but before the passengers are out, * * * the officer smells fresh marijuana. At this point the officer has reasonable suspicion that a controlled-substance crime is being committed. And we don't have backup here. As I said, while the passengers are still in the car, the officer smells the pot, says he's detected pot and he wants it; where's it at.

"The defendant and Mr. Birdsong sort of nod towards the backpack. They're still sitting in the back of the car. * * *. The officer gets the passengers out. * * *. The backpack

is still in the car. Monico finds the backpack, knives near the backpack where the defendant and Birdsong were."

And the court also concluded that Monico had asked for consent to search the backpack and that his requests were lawful:

"The officer doesn't ask to look in the backpack until everyone is out of the car. The driver says, [']Not mine, go ahead and look if you want.['] The front passenger denies any ownership. [Defendant] and Mr. Birdsong are initially silent, and then after a few seconds, Mr. Birdsong and then defendant say, yeah, it's their backpack, their marijuana [inaudible] inside.

"At this point the officer asks for permission to search. They say yes and they consent to the search. As I said, once the officer smells marijuana, he's got reasonable suspicion that there's a controlled substance offense going on involving marijuana, at this point, under ORS 131.615, he may detain and inquire about pot and ask for consent to search."

Defendant subsequently asked the trial court to clarify "how the officer was authorized to go into the car, seize the backpack, and then ask for consent." The state argued, "Well, [Monico] had probable cause to believe that the backpack contained marijuana and in a situation where he could * * * stop, detain, and ask for consent to search, and that's what he did."

The court noted that, "if [Monico] were to get a warrant, he would have had to seize the backpack, one way or the other, and then get a warrant to search it. So he seized the backpack and then he got consent to search it." Defendant asked, "So taking the backpack out of the car was a lawful seizure, is what you're saying?" The court responded, "I guess I am, yeah."

After a stipulated facts trial, defendant was convicted on all three counts. On appeal, defendant assigns error to the denial of his motion to suppress. Defendant argues (1) that he was unlawfully seized when Monico ordered him to put his hands on his head without a reasonable basis for believing that defendant posed a threat to Monico's safety; (2) that Monico illegally seized the backpack without a warrant when he removed it from the disabled car and placed it on the car's

trunk; and (3) that the subsequent discovery of marijuana was the unattenuated product of the unlawful seizures.

In response, the state argues that much of what happened up until the time that Monico asked defendant for consent to search the backpack is irrelevant, because defendant (according to the state) freely consented to the search. That is, in the state's view, even "assuming the officer unlawfully seized the backpack when he removed it from the car," the issue "reduces to whether * * * defendant's consent to the search of the backpack was valid." Citing *State v. Hall*, 339 Or 7, 24, 115 P3d 908 (2005), the state argues that Monico would have requested defendant's consent to search the backpack even if the backpack had been left in the car and that, therefore, defendant failed to establish a minimal factual nexus between the alleged unlawful police conduct and the search.

We review the denial of a motion to suppress for legal error, and we are bound by the trial court's findings of fact so long as there is evidence in the record to support those findings. *State v. Vasquez-Villagomez*, 346 Or 12, 23, 203 P3d 193 (2009). Where the trial court did not make express findings, we resolve any factual disputes in a manner that is consistent with the trial court's ultimate conclusion. *State v. Soto*, 252 Or App 50, 51, 284 P3d 1254, *rev den*, 353 Or 127 (2012).

Subsequent to the briefing and argument in this case, the Supreme Court issued *State v. Unger*, 356 Or 59, 74-75, 333 P3d 1009 (2014), which substantially revised the *Hall* analysis governing when evidence obtained during consent-based searches stemming from otherwise illegal police conduct must be suppressed. Specifically, *Unger* did away with *Hall*'s "minimal factual nexus" analysis:

"[W]e disavow the 'minimal factual nexus' part of the *Hall* test. * * * Instead, we hold that, when a defendant has established that an illegal stop or an illegal search occurred and challenges the validity of his or her subsequent consent to a search, the state bears the burden of demonstrating that (1) the consent was voluntary; and (2) the voluntary consent was not the product of police exploitation of the illegal stop or search."

*Id.*

*Unger* creates a problem for the state's position on appeal. As noted, the state's theory is that defendant failed to establish a minimal factual nexus (the *Hall* formulation) because, even if Monico had not seized the backpack by removing it from the car, Monico still would have asked for consent to search the backpack and there is no reason to think that defendant would have refused to grant that consent. Thus, the state effectively skips over the question of whether unlawful police conduct actually occurred and argues that, even if the answer is yes, the evidence would have been discovered anyway.

Regardless of whether the state's argument would have prevailed under *Hall*, the framework for analysis has now changed. Under *Unger*, if unlawful police conduct occurred in this case, then the state must demonstrate that defendant's voluntary consent was not the product of exploitation of that unlawful conduct. 356 Or at 74-75. To determine whether the state has met that burden, "we consider the totality of the circumstances, including the temporal proximity between that misconduct and the consent, and the existence of any intervening or mitigating circumstances. We also consider the nature, purpose, and flagrancy of the misconduct." *Id.* at 88.

Here, the temporal proximity between Monico's seizure of the backpack and defendant's consent to search it was almost immediate. Monico requested consent to search the very object that he had just seized, further supporting the conclusion that Monico exploited that seizure to obtain defendant's consent (or, in terms that *Unger* used, that "the consent was 'tainted' because it was 'derived from' or was a 'product of' the unlawful conduct," *id.* at 80). In addition, the record indicates that just prior to seizing the backpack, Monico had smelled marijuana, searched the car, asked defendant and the other passengers where the marijuana was located, and said that he "wanted it." After he seized the backpack, Monico asked who wanted to "claim" it. Together, these facts show that Monico acted forcefully to assert his control over defendant, the other passengers, and the property seized, and further support a conclusion that his "purpose" in seizing the backpack was directly to facilitate a

search. Indeed, it is difficult to conceive of any other reason for Monico's removal of the backpack from the car.

The state cites no mitigating or intervening circumstances that would have attenuated defendant's consent from the seizure of the backpack. Instead, the state contends that Monico "would have asked for consent to search regardless of the backpack's location," and that there is no reason to think defendant would have refused. Even if we were to agree that one can reasonably infer from this record that Monico would have asked for consent to search the backpack regardless of the seizure, the inference that defendant would have consented does not follow as easily. The principle is well-established (and was reiterated in *Unger*) that an unlawful seizure effects a qualitative change on the police-citizen encounter. *See Unger*, 356 Or at 93 ("[U]nlawful police conduct undoubtedly has an effect on citizens and on how they interact with police officers in certain circumstances[.]"); *State v. Musser*, 356 Or 148, 159, 335 P3d 814 (2014) (explaining that police misconduct "likely had an effect on [a] defendant's decision to consent"). Accordingly, we cannot assume that defendant would have consented as readily to a request to search that was not preceded by a violation of his rights.

In short, we conclude that the state, on this record, cannot demonstrate that defendant's voluntary consent was not the product of exploitation of Monico's unlawful conduct, *if* that conduct was unlawful. We must, then, consider the events leading up to Monico's seizure of the backpack, and, specifically, whether that seizure was lawful.

"Property is 'seized,' for purposes of Article I, section 9, when there is a significant interference, even a temporary one, with a person's possessory or ownership interests in the property." *State v. Juarez-Godinez*, 326 Or 1, 6, 942 P2d 772 (1997). If an intrusion is a seizure, "it requires probable cause and a search warrant or separate justification under one of the few, carefully circumscribed exceptions to the warrant requirement of Article I, section 9, of the Oregon Constitution." *State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987). Here, although the trial court concluded that Monico had probable cause to believe that the backpack contained

marijuana, Monico was required to obtain a warrant before searching it unless one of the well-established exceptions to the warrant requirement applied. The court did not identify any such exception, nor does the state cite one on appeal.

The trial court did rely on the "officer safety" exception to the warrant requirement in concluding that Monico acted lawfully in ordering defendant and the other passengers to place their hands on their heads. *See State v. Miglavs*, 186 Or App 420, 425, 63 P3d 1202 (2003), *aff'd*, 337 Or 1, 90 P3d 607 (2004) (explaining that such a search or seizure "fits within an exception to the warrant requirement if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present" (quoting *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987) (internal quotations marks omitted)). Defendant argues on appeal that the trial court erred in that respect. We conclude that resolution of that issue is unnecessary, because even if the officer-safety exception justified the initial seizure of defendant, it did not justify the later seizure of the backpack. After the car's driver and passengers had exited the vehicle and were seated on a curb, in the presence of a backup officer, there is no plausible reason (and the state offers none) why safety concerns would have required Monico to reenter the vehicle to search the backpack or to remove the backpack from the car. *See State v. Ehly*, 317 Or 66, 83 n 16, 854 P2d 421 (1993) (explaining that, "when a police officer has reason to believe that a lawfully stopped individual is dangerous and may gain immediate control of a weapon, he may conduct a search *of the area around the individual from which the individual could obtain a weapon*" (emphasis in original; citing Rudstein, Erlinder and Thomas, 1 *Criminal Constitutional Law* § 2.07[7] (1992))).

For the reasons stated above, we conclude that Monico unlawfully seized the backpack without a warrant, under circumstances in which a warrant was required. We further conclude that the state failed to demonstrate that the subsequent consent search was "not the product of police

exploitation" of the unlawful seizure. *Unger*, 356 Or at 75. Accordingly, defendant's motion to suppress should have been granted.

Reversed and remanded.